[No. C045691. Third Dist. June 8, 2005.]

ALAN F. BEYER et al., Plaintiffs and Appellants, v.
TAHOE SANDS RESORT et al., Defendants and Respondents.

## COUNSEL

McDonough Holland & Allen and Michael T. Fogarty for Plaintiff and Appellant Alan F. Beyer.

Jay-Allen Eisen Law Corporation, Jay-Allen Eisen and C. Athena Roussos for Plaintiff and Appellant Anna Ghandour.

Sinclair Wilson and Robert F. Sinclair for Defendants and Respondents.

## OPINION

**SIMS, J.**—In this action seeking to declare and quiet title to easements and obtain injunctive relief, plaintiffs Alan F. Beyer and Anna Ghandour[1] appeal from the judgment entered in favor of defendant Tahoe Sands Time Share Owners Association (defendant or the Association).[2] Plaintiffs contend easements were validly created by prior landowners (the Huntleys/Bernardses or time-share sponsors) who expressly reserved the easements when they dedicated a portion of their real property, including common areas, to a time-share project (Bus. & Prof. Code, former § 11003.5,[3] see now Bus. & Prof. Code, § 11212[4]) and conveyed legal title of the property to the Bank of California (the Bank) as trustee pursuant to a trust agreement for the time-share project. Plaintiffs contend the trial court erred in concluding the Huntleys/Bernardses retained a sufficient ownership interest in the property to preclude their creating easements in their own favor. (Civ. Code, § 805.[5]) We agree with plaintiffs and shall reverse the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

The properties at issue in this case are shown on a copy of an assessor's map attached to this opinion as an appendix. For ease of reference, we adopt the parties' usage and refer to plaintiffs' property as the "Home Parcel," and defendant's properties as the "Resort Parcels." The Resort Parcels (which contain a motel structure and individual cottages) include parcels on opposite

---

[1] Anna Ghandour joined in Beyer's appellate briefs.

[2] The complaint named as defendants Tahoe Sands Resort, Tahoe Sands Time Share Owners Association, and Tahoe Sands Time Share Owners Association Board of Directors. The answer to the complaint, the judgment, and the appellate briefs refer only to Tahoe Sands Time Share Owners Association.

[3] Former Business and Professions Code section 11003.5 (repealed by Stats. 2004, ch. 697, § 4) provided at the time of the Huntleys/Bernardses' creation of the time-share project: "(a) A 'time-share project' is one in which a purchaser receives the right in perpetuity, for life, or for a term of years, to the recurrent, exclusive use or occupancy of a lot, parcel, unit, or segment of real property, annually or on some other periodic basis, for a period of time that has been or will be allotted from the use or occupancy periods into which the project has been divided. [¶] (b) A 'time-share estate' is a right of occupancy in a time-share project which is coupled with an estate in the real property. [¶] (c) A 'time-share use' is a license or contractual or membership right of occupancy in a time-share project which is not coupled with an estate in the real property."

[4] The new Vacation Ownership and Time-Share Act of 2004 (Bus. & Prof. Code, § 11210 et seq.) becomes operative on July 1, 2005. (Bus. & Prof. Code, § 11288; Stats. 2004, ch. 697, § 14.)

[5] Undesignated statutory references are to the Civil Code. Section 805 provides: "A servitude thereon cannot be held by the owner of the servient tenement."

sides of State Highway 28—a "Lakeside Parcel" (Lot 12A) bordering Lake Tahoe, and a "Mountainside Parcel" (which is part of Lot 12) to the north of the highway. The Home Parcel was originally part of the Mountainside Parcel. A residence sits on the Home Parcel and encroaches 50 feet onto the Mountainside Parcel.

On May 29, 2001, plaintiffs filed a complaint for declaratory relief, quiet title, and injunctive relief, against defendant, claiming the existence of three easements benefiting plaintiffs' property and burdening defendant's property: (1) a lakeside easement to allow plaintiffs to cross over the Lakeside Parcel for access to Lake Tahoe;[6] (2) an access easement to allow plaintiffs to cross the Mountainside Parcel for ingress/egress to get from Highway 28 to the Home Parcel; and (3) an encroachment easement because the house on their Home Parcel encroaches onto the Mountainside Parcel.

The Association filed a cross-complaint to quiet title.

A bench trial was held, at which evidence was adduced concerning the chain of title. We have no need to consider the chain of title predating 1979 (at which time all parcels came under ownership of the Huntleys/Bernardses), because plaintiffs on appeal admit any preexisting easements were terminated by merger[7] when the Huntleys/Bernardses acquired all the affected properties.

Thus, by November 1979, the Huntleys/Bernardses acquired fee title ownership of all real property at issue in this case (as well as adjacent land).

At some point in time, the Mountainside Parcel and Lakeside Parcel were developed into a motel complex, with a two-story motel building on the Lakeside Parcel and cottages on the Lakeside and Mountainside Parcels.

In 1980, the Huntleys/Bernardses built a house on the Home Parcel, which encroached 50 feet onto the Mountainside Parcel.

On October 22, 1981, the Huntleys/Bernardses recorded[8] a declaration of time-share dedication, which was amended in February 1982 to comply with

---

[6] But for the lakeside easement, plaintiff would have to travel more than a mile to the next public vehicular access to the lake.

[7] "A servitude is extinguished: [¶] 1. By the vesting of the right to the servitude and the right to the servient tenement in the same person . . . ." (§ 811.)

[8] Any instrument affecting the title to real property may be recorded by the county recorder of the county where the property is situated. (§ 1169; Gov. Code, § 27280, subd. (a).) Recorded instruments provide constructive notice to subsequent purchasers. (§§ 1213, 1215; *Citizens For Covenant Compliance v. Anderson* (1995) 12 Cal.4th 345, 355 [47 Cal.Rptr.2d 898, 906 P.2d 1314] (*Citizens*).)

California Department of Real Estate (DRE) regulations governing time-share projects. The Huntleys/Bernardses declared they were the owners of real property described in an exhibit (attached to the original but not to this court's copy of the amended declaration in the record on appeal), as follows:

(1) Parcel One—a portion of Lots 13 and 13A of the Agate Bay Subdivision (not at issue in this case);

(2) Parcel Two—Lot 12A (the Lakeside Parcel);

(3) Parcel Three—the west 125.1 feet of Lot 12 (the Mountainside Parcel) "EXCEPTING THEREFROM the North 100 feet thereof [the Home Parcel];"

(4) Parcel Four—A nonexclusive easement[9] for all purposes over the westerly 20 feet of Lot 12A, together with an easement over all land lying between the east and west lines of said 20-foot strip extended south to Lake Tahoe; and

(5) Parcel Five—a portion of Lot 11 (not at issue in this case).

The descriptions continued as follows:

"EXCEPTING AND RESERVING FROM PARCEL THREE [the Mountainside Parcel] as described above, a perpetual nonexclusive right of way and easement for ingress and egress, including the right to install, maintain, repair and replace a driveway, and an easement for the installation and maintenance of public utilities including sewer, including the right to connect to the existing sewer line, water, gas and electricity over and upon PARCEL THREE as hereinabove described, and further EXCEPTING AND RESERVING an easement for encroachment and setback purposes over and upon the Northerly fifty (50) feet of the hereinabove described PARCEL THREE.

"FURTHER EXCEPTING AND RESERVING FROM PARCEL TWO [the Lakeside Parcel] as above described, a perpetual nonexclusive easement for all purposes, including the right of access to the Lake Tahoe beach front, over the Westerly twenty (20) feet of Lot 12A . . . , together with an easement over all land lying between the East and West lines of said 20 feet [sic] strip extended South to . . . Lake Tahoe.

---

[9] As indicated, plaintiffs concede any prior easements were extinguished by merger when all parcels came into ownership of the Huntleys/Bernardses in 1979.

"The easements excepted and reserved as above described, shall be appurtenant to the Northerly 100 feet of Lot 12 [i.e., the Home Parcel] . . . ."

The preamble to the declaration of time-share dedication stated that the Huntleys/Bernardses were dedicating 14 specified resort units (not all units[10]) for time-share use for 51 weeks every year for 30 consecutive years. They established a plan for selling individual memberships in the Association, which would entitle members, for a period of 30 years, to reserve and use individual units for a period of one week during a designated season, and to use the recreational facilities and "Common Area" of the property during the reserved time periods.

"Common area" was defined in article I as, "the land, including landscaping, recreational facilities, and other improvements located on the property, excluding the individual units. The Common Area includes, without limitation: parking and driveway areas; stairs, bearing walls, columns, girders, subfloors, unfinished floors, roofs and foundations; central heating, conduits, pipes, plumbing, wires and other utility installations required to provide power, light, telephone, gas, water, sewage, drainage, heat, and air conditioning."

Article III of the declaration stated, "The Common Areas [as defined in article I] are hereby dedicated as the Common Areas of the Project."

The preamble to the declaration also stated: "NOW, THEREFORE, Declarant hereby declares that the Property shall be held, conveyed, mortgaged, encumbered, leased, rented, used, occupied, sold, and improved, subject to the following declarations, limitations, covenants, conditions, restrictions, and easements, all of which are for the purpose of enhancing and protecting the value and attractiveness of the units, and the Property, and every part thereof, in accordance with the plan for the improvement of the Property and the dedication thereof to time share units. All of the limitations, covenants, conditions, restrictions and easements shall constitute covenants which shall run with the land and shall be binding upon Declarant and its successors and assigns, and all parties having or acquiring any right, title or interest in or to any part of the real property."

Article XX of the time-share dedication stated: "RESERVATION OF EASEMENTS [¶] Declarant hereby reserves to itself, its successors and assigns, an easement for unfettered use of the Common Areas. Declarant also

---

[10] Plaintiffs cite an original trust agreement, that indicated the Silver Sands Resort contained 72 units. However, an amended trust agreement said the Resort contained 65 units.

reserves the reasonable right to enter the dedicated units for purposes of inspection, cleaning and maintenance and for any other reasonable purposes."

Also on October 22, 1981, the Huntleys/Bernardses conveyed the Resort Parcels by a grant deed to the Bank of California, "as Trustee under the Agreement and Declaration of Trust (Silver Sands Resort Trust)[11] dated October 21, 1981." The grant deed referred to exhibit A, which contained the same property descriptions, including the easements, described in the declaration of time-share dedication.

An October 21, 1981, "AGREEMENT AND DECLARATION OF TRUST (Silver Sands Resort Trust)" (which authorized amendment) was amended in February 1982 to comply with DRE regulations. The "FIRST AMENDED AGREEMENT AND DECLARATION OF TRUST (Silver Sands Resort Trust)" identified the following parties:

Bank of California as trustee;

The Huntleys/Bernardses as trustors;

Silver Sands, a California partnership, as beneficiary; and

The Association as third party beneficiary.

The trust agreement said the trustors were the owners of the property, known as the Silver Sands Resort, described in an exhibit.[12] The property was encumbered by deeds of trust. The beneficiary was selling vacation memberships pursuant to the time-share dedication. "Trustor has agreed that the legal title to the Property shall be taken and held by Trustee and that Trustee shall hold the same as trustee for the uses and purposes and upon the trust hereinafter set forth." "The Trustee shall hold legal title to the Trust Property [defined as the property, together with the proceeds thereof, including, but not limited to, installment contracts and proceeds, excluding, however, down payments] in trust for the uses and purposes as herein set forth. On or before the effective date of this trust, Trustor shall convey the Property to Trustee subject only to the Declaration, and the exceptions of title set forth in Exhibit C [omitted from the record on appeal], and Trustee will be

---

[11] As we discuss *post*, plaintiffs litigated this case with the understanding that the Huntleys/Bernardses (who, together with another entity in which they were involved, were partners in Silver Sands) were beneficiaries of the trust.

[12] The exhibit described the five parcels, which we described *ante*.

furnished a CLTA Owner's Policy of Title Insurance, dated as of the date of conveyance, insuring that title to the Property is vested in Trustee, subject only to the above referenced matters, with liability in an amount not less than the aggregate amount presently owing on the underlying notes. Concurrently with such conveyance, Beneficiary shall assign to Trustee all its right, title and interest in all Installment Contracts executed by Beneficiary on or before the date hereof. Upon termination of this Trust in accordance with Article 10 hereof, Trustee shall cause title to the Property to be reconveyed to Trustor or their heirs, executors and/or assigns."

Of particular significance to this appeal is that article 4 of the trust agreement said in part: "Trustee [the Bank] shall have no right, title or interest in or to the Trust Estate, except as the holder of legal title thereto, [and] *Trustee shall have no right to the possession or control of the Trust Property or any portion thereof*, . . . the power and the duty of Trustee being to deal with and administer the Trust Property and the Proceeds in accordance with the express authority herein contained and not otherwise . . . ." (Italics added.)

The trust agreement said that, although the beneficiary had no right, title, or interest in the trust property, "Beneficiary shall have the sole and exclusive right to the possession, control and management of the Trust Property and the right to deal with the same as if the same were not otherwise impressed with this Trust (excepting from such right the right to transfer or assign legal title to the Trust Property)."

The trust agreement stated it was irrevocable as long as time-share segment owners, other than the sponsors, had the right to use the resort as time-share owners, but the trust was subject to termination following the first to occur of the following: (a) receipt of notice of the beneficiary's election to terminate the trust if the beneficiary's application for a final subdivision  public report was denied; or (b) at the election of beneficiary, at any time after December 31, 2015, or the earlier termination, if any, of the declaration. Upon the occurrence of either of these events, "Trustee shall convey all of the Trust Estate to the Trustor, or their heirs, executors, successors, and/or assigns . . . ."

The trust agreement said, "The sole interests of the Association under this Agreement are the approval rights expressly granted to the Association elsewhere in this Agreement, and the rights and obligations set forth in subparagraph 4.3(h) [taxes]."

After the 1981 creation of the time-share project, the following conveyances took place:

On May 23, 1986, the Huntleys/Bernardses conveyed everything they had to Edmond and Anna Ghandour. Thus, the Huntleys/Bernardses conveyed by grant deed the Home Parcel and their "personal rights" to the supposed easements (the lakeside easement, the Lot 12 access easement, and the encroachment easement) described in the 1981 deed, as appurtenant to the Home Parcel. On the same day, the Huntleys/Bernardses and Silver Sands also recorded an "ASSIGNMENT OF BENEFICIAL INTEREST," granting and assigning to the Ghandours "all right, title and interest in and to the trustor's interest and the beneficial interest of Seller, as defined and limited in the Purchase Agreement among the parties of even date herewith . . . , under that certain First Amended Agreement and Declaration of Trust . . . under which the Trustee holds legal title to all the certain real property . . . described in Exhibit A [Home Parcel and three easements]. " Also recorded on the same day was a "MEMORANDUM OF AGREEMENT FOR THE SALE OF SILVER SANDS RESORT," which included a "Vendor's Lien," stating, "It is understood that, to the extent this Agreement is considered a transaction involving real estate under the laws of the State of California, SELLER retains a vendor's lien as described in California Civil Code Section 3046, notwithstanding any other security device provided for in this Agreement." The vendor's lien did not affect the Home Parcel.

On September 9, 1993, a quitclaim deed was recorded, by which Edmond Ghandour quitclaimed his interest to Anna Ghandour. (A supplemental interspousal transfer was later filed.)

On February 3, 1994, the Huntleys/Bernardses foreclosed on the beneficial interest in the trust pursuant to the vendor's lien. At the foreclosure sale they made the highest bid and thereby reacquired "[a]ll of the beneficial interest" in the trust agreement, including the reversionary interest.

On December 19, 1997, Anna Ghandour (Ghandour) by grant deed conveyed to Alan Beyer an undivided 50 percent interest in the fee title to the Home Parcel and the supposed easements.

On March 30, 2001, all outstanding interests in the Resort Parcels, including those of the trustor, trustee, and beneficiary, were consolidated in the Association by a series of deeds. Thus, a quitclaim deed was recorded whereby the Huntleys/Bernardses (as well as Markation, Inc. and Leonard Labagh, P.C.) quitclaimed to the Association all right, title, interest, and claims to the real property described on an attached exhibit, including fee, remainder, leasehold, easement, license and/or any other form of interest. The

exhibit described the Resort Parcels and expressly excluded the Home Parcel, but did not mention the easements.

Also on March 30, 2001, similar quitclaim deeds were recorded (1) from Wells Fargo Bank (successor to the Bank of California) to John Rogers Burk, as trustee of the Silver Sands Resort Trust, and (2) from John Rogers Burk to the Association.

·None of the 2001 deeds reserved any easements.

Even before the 2001 conveyances, the Association tried to move the resort parking to the area of the lakeside easement in 1998, but moved it back when Ghandour complained. In 1999, the Association again moved the resort parking to the area of the lakeside easement, precluding vehicular access and impeding pedestrian access to the lake. Ghandour complained, but to no avail. The Association hopes to obtain approval of Placer County and the Tahoe Regional Planning Association to redesign the resort to consolidate all the time-share units onto the Lakeside Parcel to minimize travel across the highway. The plan is to have a 10-foot-wide walking path and landscaping on the land on which plaintiffs claim an easement, which would impede the vehicular access claimed by plaintiffs.

Following the bench trial, the trial court on June 17, 2003, issued an intended decision, concluding any prior easements were extinguished in 1979 when the Huntleys/Bernardses acquired title to all the parcels in question, and subsequent attempts to create the claimed easements were ineffective because the Huntleys/Bernardses always retained possessory interests in the land, even without the purported easements.

Plaintiffs objected to the intended decision and requested a statement of decision "on the issue of intention of plaintiffs and/or their predecessors-in-interest on the issue of merger."

On July 18, 2003, the trial court issued a statement of decision, finding the evidence failed to establish the existence of the claimed easements. The court said any prior easements were terminated by merger (§ 811, fn. 7, *ante*) when the Huntleys/Bernardses acquired all parcels in 1979, at which point the Huntleys/Bernardses had the right to go anywhere and do any lawful activity they wanted anywhere on the parcels without need of any easements.

The court noted plaintiffs claimed post-1979 documents described the easements. The court said it need not examine whether the documents terminated[13] the easements because they had already been terminated by merger in 1979.

On October 15, 2003, judgment was entered. The judgment stated any prior easements (assuming they existed) were extinguished by the merger doctrine in 1979, and no valid easements were created by the 1981 time-share documents or any subsequent conveyances. The judgment further stated the dedication of common areas to the time-share project constituted servitudes that would have priority over any subsequent easements.

The judgment nevertheless held plaintiffs had acquired easements by prescription,[14] as follows: (1) a limited easement for ingress, egress, and utilities over Lot 12; (2) an easement for parking and building access on Lot 12; and (3) an encroachment easement. (The trial court stated in the intended decision there was no lakeside easement by prescription because plaintiffs' use of the lakeside access over Lot 12A was infrequent and seasonal.)

Plaintiffs appealed from the judgment.

## DISCUSSION

### I.  *Standard of Review*

Defendant in its respondent's brief cites authority for the proposition that appellate courts review trial courts' discretionary decisions under an abuse of discretion standard. However, defendant fails to identify any discretionary decision of the trial court necessary to this appeal.

■  The interpretation of an easement that does not depend on conflicting extrinsic evidence is a question of law. (*Van Klompenburg v. Berghold* (2005) 126 Cal.App.4th 345, 349 [23 Cal.Rptr.3d 799]; *McCann v. City of Los Angeles* (1978) 79 Cal.App.3d 112, 115, fn. 2 [144 Cal.Rptr. 696].) We apply independent review to questions of law. (*Kellogg v. Garcia* (2002) 102 Cal.App.4th 796, 802–803 [125 Cal.Rptr.2d 817].) To the extent that resolution of the appeal turns on factual findings made by the trial court, we review such findings under a substantial evidence standard. (*Ibid.*)

---

[13] It does not appear that anyone argued these documents *terminated* any easements.

[14] A prescriptive easement is created by open and notorious use that is hostile and adverse, continuous and uninterrupted for a five-year statutory period under a claim of right. (§ 1007; Code Civ. Proc., § 321; *Felgenhauer v. Soni* (2004) 121 Cal.App.4th 445 [17 Cal.Rptr.3d 135].)

## II. *Huntleys/Bernardses as Beneficiaries of Trust*

We first dispose of plaintiffs' assertion that the Bank held title not for the Huntleys/Bernardses, but for the designated beneficiary—Silver Sands partnership, which consisted of not only the Huntleys/Bernardses but also an entity called Markation, Inc. Plaintiffs make this assertion in connection with their argument about the merger doctrine, i.e., that easements are extinguished by subsequent vesting of the right to the servitude and the right to the servient tenement in the same person. (§ 811.) According to plaintiffs, the Huntleys/Bernardses would not have had the right to use the common areas dedicated to the time-share project absent a reservation of easements, because title was conveyed to the Bank and the beneficiary—Silver Sands—was granted the exclusive right to possession of the property.

We agree with defendant that plaintiffs have forfeited this point about Silver Sands, because they litigated the case with the understanding that the Huntleys/Bernardses were beneficiaries of the trust, and plaintiffs did not assert otherwise until their objection to the court's intended decision, after having repeatedly taken the position during trial that the beneficial interest was held by the Huntleys/Bernardses.

Thus, in his opening statement, plaintiffs' counsel told the court, "the setup was to be that the Huntleys/Bernardses would retain what they described as the beneficial interest in the trust. [Description of reversionary rights]. That was all the beneficial interest that they kept for themselves, the Huntley[s]/Bernards[es]. The rest of it went to the Bank of California." Plaintiffs' title expert testified he believed the Huntleys/Bernardses owned the beneficial interest in the trust as to the resort properties. In closing argument, plaintiffs' counsel said, "Huntleys/Bernards[es] held the beneficial interest in the trust, and the bank held title to the property."

A party cannot change his theory of the case on appeal. (*Richmond v. Dart Industries, Inc.* (1987) 196 Cal.App.3d 869, 874 [242 Cal.Rptr. 184].)

Plaintiffs argue the statements made during trial were inadvertent error shown to be erroneous by the unambiguous language of the trust agreement.

However, had plaintiffs made an issue of Silver Sands during trial, defendant may have been able to develop evidence concerning ownership of the entities to pierce the corporate veil. For example, the record reflects John Huntley was president of Markation, Inc.

Thus, in this appeal we treat the Huntleys/Bernardses as beneficiaries of the trust.

### III. *The Claimed Easements Were Validly Created*

Plaintiffs concede the mere recording of the declaration of time-share dedication did not create the easements described in that document. Rather, plaintiffs' position is that the easements "sprang into effect the moment the time share parcels were conveyed to Bank of California subject to the recorded Time Share Declaration." (See *Citizens, supra,* 12 Cal.4th 345, 348 [servitudes were not created by mere recording of subdivision developer's declaration, but sprang into effect upon subsequent conveyance].)[15] We agree with plaintiffs.

■ "An easement is a nonpossessory ' "interest in the land of another that gives its owner the right to use the land of another or to prevent the property owner from using his land." ' [Citations.]" (*Kazi v. State Farm Fire & Casualty Co.* (2001) 24 Cal.4th 871, 880 [103 Cal.Rptr.2d 1, 15 P.3d 223].) In contrast to fee simple property ownership, which provides the owner the right to the surface and to everything permanently situated beneath or above it, "an appurtenant easement is a burden on land that creates a right-of-way or the right to use the land only. (. . . § 801.)[16] It represents a limited privilege to use the land of another for the benefit of the easement holder's land, but does not create an interest in the land itself. [Citations.]" (*Kazi, supra,* 24 Cal.4th at pp. 880–881.)

"The land to which an easement is attached is called the dominant tenement; the land upon which a burden or servitude is laid is called the servient tenement." (§ 803.) "A servitude can be created only by one who has a vested estate in the servient tenement." (§ 804.)

"A servitude thereon cannot be held by the owner of the servient tenement." (§ 805.)

■ The issue is whether, at the time of the 1981 creation of the time-share project, the Huntleys/Bernardses retained ownership of the servient tenement (the Resort Parcels) to prevent the creation of the claimed

---

[15] Easements may also be created by contract rather than conveyance (*Golden West Baseball Co. v. City of Anaheim* (1994) 25 Cal.App.4th 11, 35 [31 Cal.Rptr.2d 378]), but plaintiffs do not claim the easements in this case were created by contract.

[16] Section 801 provides: "The following land burdens, or servitudes upon land, may be attached to other land as incidents or appurtenances, and are then called easements: [¶] . . . [¶] 4. The right-of-way . . . ." A "right of way" is primarily a privilege to pass over another's land. (*County of Alameda v. Ross* (1939) 32 Cal.App.2d 135 [89 P.2d 460].)

easements appurtenant to their Home Parcel, pursuant to section 805, which prevents a landowner from holding an easement on his own land. Plaintiffs acknowledge this rule proceeds from the rationale that a person does not need an easement in his or her own land, because all the uses of an easement are already included in the general right of fee ownership.

Here, legal title to the property was conveyed to the Bank, raising the question whether the Huntley/Bernardses were no longer the "owner" under section 805.

■ We conclude that "owner" under section 805 means the owner of the full fee title, both legal and equitable, such that a property owner who owns less than full title may validly create easements in his own favor on his land. We reach this conclusion because the merger doctrine (whereby existing easements are extinguished when title to the easement and the servient tenement merge in the same person) requires a unity of title, in that title and ownership of both tenements must be coextensive and equal in validity, quality, right to possession, and all other characteristics. We conclude that the law that has developed around the merger doctrine (which addresses termination of existing easements) should apply to the question of creation of easements.

The merger doctrine is codified in section 811, which states, "A servitude is extinguished: [¶] 1. By the vesting of the right to the servitude and the right to the servient tenement in the same person . . . ."

■ Case law says merger requires a unity of title. Thus, plaintiffs cite, for example, *Leggio v. Haggerty* (1965) 231 Cal.App.2d 873 [42 Cal.Rptr. 400], where the Fifth Appellate District, in a discussion of apportionment, said quitclaims of an easement appurtenant to the owner of a servient estate by owners of portions of the dominant estate extinguished the easement only as to the benefits shared in the easement by the owners giving the quitclaim deeds. *Leggio* said, "To extinguish an easement as far as all the dominant tenement is concerned, a complete merger is required . . . . [¶] . . . '[T]he ownership of the dominant and servient estates must be coextensive and equal in validity, quality, and all other characteristics.'" (*Id.* at pp. 881–882.) "'In order that an easement will be extinguished under the doctrine of merger, there must be unity of title . . . . [T]he owner should have a permanent and enduring estate, an estate in fee, in both the dominant and servient estate, not liable to be disjoined again by operation of law. In any event, mere unity of possession is not enough. Further, the ownership of the two estates should be coextensive and equal in validity, quality, and all other

circumstances of right. Accordingly, an easement is not extinguished under the doctrine of merger by the acquisition by the owner of the dominant or servient estate of title to only a fractional part of the other estate.' " (*Id.* at pp. 883–884; see also, e.g., *Hemmerling v. Tomlev, Inc.* (1967) 67 Cal.2d 572, 575 [63 Cal.Rptr. 1, 432 P.2d 697] [no merger where individual owners of individual parcels combined to purchase a separate parcel and share its water supply]; *Cheda v. Bodkin* (1916) 173 Cal. 7, 16–17 [158 P. 1025] [no merger where owner of one parcel owned water rights in another parcel in common with other people]; *Signorelli v. Edwards* (1932) 120 Cal.App. 614, 621 [8 P.2d 194].)[17] ■ "A merger occurs when a greater and lesser estate are held by the same person. In order to effect an extinguishment by merger, the title and ownership held in both tenements must be coextensive and equal in validity, quality, right to possession, and all other characteristics. [Fn. omitted.] The easement is not extinguished if the person has unequal title or rights in the servient and dominant tenements. [Fn. omitted.]" (6 Miller & Starr, Cal. Real Estate (3d ed.) Easements, § 15:75, pp. 232–233.)

We conclude the same principles should apply to the *creation* of easements. The same policy is at issue whether an easement is created or extinguished: ownership of the underlying parcel makes the easement unnecessary. But where the "owner" does not own legal title, we cannot say with certainty that the easement is unnecessary, as this case well illustrates. Thus, the term "owner" in section 805 (which says a servitude cannot be held by the owner of the servient tenement) means the owner of full fee title, both legal and equitable.

Here, the Huntleys/Bernardses did not have full fee title of the servient tenement, because they conveyed legal title of the Resort Parcels to the Bank in connection with the time-share project. Since there was not a complete unity of title, the Huntleys/Bernardses were entitled to create easements in their own favor.

The foregoing discussion, while legally correct, has an ethereal angels-on-the-head-of-a-pin quality about it. But a more commonsense analysis of plaintiffs' situation leads us to the same conclusion.

---

[17] Plaintiffs also cite cases where government entities held highway easements for the benefit of the public and later acquired fee title to the underlying lands. (E.g., *People v. County of Marin* (1894) 103 Cal. 223, 231–232 [37 P. 203].) However, the California Supreme Court said the holding of *People v. County of Marin* was not that there is a distinction between different kinds of property interests, but that the state prison authorities (who sought to close the highway) had no legislative mandate to exercise the admitted power of the state over the road. (*County of Marin v. Superior Court* (1960) 53 Cal.2d 633, 637–638 [2 Cal.Rptr. 758, 349 P.2d 526].) We therefore do not rely on the highway cases.

The purpose of section 805 is to avoid nonsensical easements—where they are without doubt unnecessary because the owner owns the estate. Here, we must look at the entirety of the time-share transaction. The legal title was conveyed out to the Bank. It is logical that the owners of the home would want to protect easements regardless of what happened to the time-share parcel. The time-share parcel could be sold, or as happened, foreclosed upon. The easements were, in fact, necessary, as witnessed by subsequent events in this case, where the time-share association refused to recognize the easement rights.

Moreover, the equities are decidedly with plaintiffs. Their predecessors' intent—to protect access to the lake—was clear. Easements were recorded and all time-share purchasers were on notice. Defendant says the equities are with it because plaintiffs lost title to the time-share parcel by sheriff's levy when they failed to pay the promissory note. But the failure of a commercial venture such as a time-share project was precisely the aim of recording the easements to protect the Home Parcel. The equities are with plaintiffs.

Defendant maintains the trial court found its decision did not result in any hardship to the Huntleys/Bernardses. However, the Huntleys/Bernardses are not parties to this case, and moreover the cited portion of the statement of decision merely said the extinguishment of prior easements when the Huntleys/Bernardses acquired all parcels in 1979 did not cause hardship. We are not concerned with the 1979 events in this appeal.

■ Defendant argues the transfer of bare legal title to the Bank as trustee under a trust agreement did not "in the eyes of equity" effect a separation of titles between the Home Parcel and the Resort Parcels. Defendant argues the transfer was a mere security device. Defendant argues as follows: Fee ownership is defined by three characteristics—possession, use, and disposition. (*Hagge v. Drew* (1945) 27 Cal.2d 368, 376 [165 P.2d 461].) Equity looks at substance, not form. (§ 3528; *Strike v. Trans-West Discount Corp.* (1979) 92 Cal.App.3d 735 [155 Cal.Rptr. 132].) "The interest of the beneficiary of a trust is an equitable estate. [Fn. omitted.] Although the trustee holds legal title to the property to carry out the terms of the trust, the rights of the beneficiary are recognized and protected by the courts of equity, and the beneficiary is considered to be the real owner of the property. [Fn. omitted.]" (3 Miller & Starr, Cal. Real Estate, *supra,* Estates, § 9:2, p. 4.) A court sitting in equity has broad powers to accept or reject a finding of ownership in the context of a claim of merger. (*Rumpp v. Gerkens* (1881) 59 Cal. 496, 501–502.)

However, the general principle that a trust beneficiary is considered to be the real owner of trust property does not diminish the fact that the trust beneficiary does not have full fee title to the property.

■ Moreover, defendant fails to show that this case turns on an exercise of discretion by the trial court. Defendant cites the reporter's transcript, where (1) the court asked the parties, and they confirmed, that the Bank held only "bare" legal title, and (2) one plaintiff testified her ownership of the beneficial interest in the resort entitled her to all incidents of ownership, including possession. In its statement of the case, defendant cites the trial court's written intended decision that the conveyance to the Bank was "for the purpose of securing the payment of obligations underlying the timeshare project—a security device." However, appeals will not be decided based upon tentative decisions of trial courts. (*People ex rel. State Air Resources Bd. v. Wilmshurst* (1999) 68 Cal.App.4th 1332, 1341 [81 Cal.Rptr.2d 221].)

Moreover, even if we were to consider the intended decision, it appears the trial court's decision was based on its conclusion the easements were not necessary because the Huntleys/Bernardses always retained their possessory interest in the Resort Parcels even without the easements. We have explained this conclusion was wrong because the retention of possessory interests did not preclude creation of the easements.

Defendant argues the merger cases are inapplicable because they relate to *termination* of easements, not *creation*. As we have explained, we believe the same principles apply.

Defendant cites *Renden v. Geneva Development Corp.* (1967) 253 Cal.App.2d 578 [61 Cal.Rptr. 463] (*Renden*), which said a property owner could reserve an easement when he retained ownership but turned over possession under a lease, because without the easement the owner would not have been able to use the land during the lease period.[18] Defendant observes *Renden* helps the defense, because the Huntleys/Bernardses retained a possessory interest in the land on which the claimed easements were located after creation of the time-share project, and *Renden*, referring to the Restatement (First) of Property, Servitudes, section 497, said, "An easement is extinguished by merger if the owner of the dominant tenement may do the things permitted by the easement by virtue of an estate in the servient tenement also

---

[18] Plaintiffs, citing *Renden, supra,* 253 Cal.App.2d 578, argue they would not have been able to use the land but for the easements, because Silver Sands had the exclusive right to possession. However, we have explained plaintiffs have forfeited their argument about Silver Sands.

owned by him." (*Renden, supra,* 253 Cal.App.2d at p. 587.) Defendant argues sections 805 and 811 codified the common law expressed in the initial Restatement provision, and defendant quotes a Restatement comment that "unity of estates in a dominant and a servient tenement causes an extinguishment of the easement only when the interests united are of such a character as to entitle the owner of them to make the use authorized by the easement without reference to its existence." (Rest., Property, Servitudes, § 497, com. f, p. 3068.) Defendant draws the conclusion that, in order to preclude the creation of an easement, it is not necessary that titles to the dominant and servient tenements be exactly duplicative.

Defendant fails to compare the first Restatement to the current (published in 2000) Restatement Third of Property, Servitudes, section 7.5, which states: "A servitude is terminated when *all the benefits and burdens* come into a single ownership." (Rest.3d Property, Servitudes, § 7.5, italics added.)

We disagree with *Renden, supra,* 253 Cal.App.2d 578, to the extent it suggests merger could be accomplished by something less than total unity of title.

Defendant argues some of the merger cases cited by plaintiff are inapplicable or actually favorable to the defense. Thus, for example, defendant says *Signorelli v. Edwards, supra,* 120 Cal.App. 614, where the parties held uncompleted contracts for purchase of the dominant and servient parcels, properly found the estates in the dominant and servient parcels were not sufficiently coextensive to terminate the easements. Defendant argues *Hemmerling v. Tomlev, Inc., supra,* 67 Cal.2d 572, had distinguishable facts, but defendant fails to set forth those facts or explain why they are materially distinguishable. Defendant fails to persuade us that the merger doctrine is inapplicable to the creation of easements.

We conclude the easements claimed by plaintiffs were validly created in 1981 when title was conveyed to the Bank in connection with the time-share project.

In light of our conclusion, we need not address plaintiffs' argument that DRE time-share regulations authorized creation of the easements.

We conclude the easements were created in 1981, when the time-share project was created. The easements were not terminated by any of the

subsequent transactions, i.e., the 1986 conveyance transferring to the Ghandours everything the Huntleys/Bernardses had, the 1994 foreclosure by which the Huntleys/Bernardses reacquired all rights in the Resort Parcels, and the 2001 conveyances to defendant. (*Citizens, supra,* 12 Cal.4th 345, 363–368 [recorded restrictions binding on subsequent purchasers].) Defendant does not contend that any subsequent event caused termination of the easements after they were created in 1981.

Because we conclude the easements were validly created and have not been terminated, the judgment must be reversed.

### IV. *Subordination*

Plaintiffs also complain the trial court erred in stating in the judgment that, even if the easements were validly created, they would be subordinate to the time-share holders' use of the property. Plaintiffs ask that we remand the case to the trial court to determine how their rights and the time-share holders' rights should be balanced to accommodate their respective uses of the parcels. We shall conclude plaintiffs' rights are not subordinate to the time-share servitudes. We shall remand for the trial court to determine whether injunctive or other relief is necessary.

Thus, the judgment stated the pleadings asked the court to declare the respective property interests and rights and to enter injunctive relief prohibiting any uses of the property inconsistent with those rights. The judgment said the rights and liabilities created by the time-share declaration, including dedication of the common areas to the time-share project, "constitute[d] servitudes which have priority over all subsequent grants, reservations or creations of easements burdening the Tahoe Sands Properties in favor of plaintiffs, if any. All such subsequent grants, reservations or creations of use rights in the Tahoe Sands Properties are subordinate to the reasonable use of the Tahoe Sands Properties under the Declaration . . . ." The judgment said the easements claimed by plaintiffs were assertedly created by the grant deed to the Bank, which occurred *after* recording of the declaration.

Plaintiffs note the deed to the Bank was recorded immediately (two minutes) after the time-share declaration. Plaintiffs argue the recording of the declaration did not, by itself, create the servitudes in favor of the time-share project, so long as the Huntleys/Bernardses retained ownership of the time-share parcels. Plaintiffs argue the servitudes in favor of the time-share holders and the easements in favor of the Huntleys/Bernardses were created simultaneously. We agree.

Thus, " 'Recording a declaration or plat setting out servitudes does not, by itself, create servitudes. So long as all the property covered by the declaration is in a single ownership, no servitude can arise. Only when the developer conveys a parcel subject to the declaration do the servitudes become effective.' " (*Citizens, supra*, 12 Cal.4th 345, 365, citing with approval a comment in the then tentative, now final, Rest.3d Property, Servitudes, § 2.1, com. c, p. 55.)

Defendant suggests the rights of the time-share holders have priority because those rights were stated in the dedication portion of the time-share declaration, while the easements claimed by plaintiffs were set forth in an exhibit to the declaration, the only purpose of which was to describe the property encumbered by the declaration. Defendant also claims priority of time-share rights is shown because the declaration said the declarant (the developer) reserved to itself and its successors (i.e., defendant) "unfettered" use of the common areas. Neither point demonstrates subordination of plaintiffs' rights.

Defendant argues that, by public policy, developer-created easements are to be subordinate to use rights needed for proper time-share operation, as assertedly reflected in DRE regulation 2812.1, subdivision (b), which provides, "The time-share sponsor may reserve easements in the real property . . . provided that the sponsor covenants to use the easements in a manner that will minimize any adverse impact any adverse impact [*sic*] upon the use and enjoyment of the dwelling unit by any time-share owner occupying it." However, defendant's use of ellipsis points hides the qualification that the regulation is talking about easements in real property "conveyed for purposes reasonably related to the conduct of commercial activities in the same structure in which the dwelling unit of the time-share project is located." (Cal. Code Regs., tit. 10, § 2812.1, subd. (b).) No such easement is at issue in this appeal, and defendant offers no other authority for declaring plaintiffs' rights subordinate to defendant's rights.

We conclude the trial court erred in determining that plaintiffs' easements are subordinate to the servitudes in favor of the time-share project.

The complaint sought injunctive relief because defendant was refusing to allow plaintiffs unimpaired access to the property. The judgment ordered plaintiffs to remove improvements from Lot 12. We shall remand for the trial court to determine whether injunctive or any other relief is appropriate in light of our opinion.

## DISPOSITION

The judgment is reversed and the case remanded to the trial court. Plaintiffs shall recover their costs on appeal. (Cal. Rules of Court, rule 27(a).)

Scotland, P. J., and Raye, J., concurred.